# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

FILED-CLERK
U.S. DISTRICT COURT

03 JAN 17  PM 4:51

TEXAS-EASTERN

BY_____

| | | |
|---|---|---|
| RETRACTABLE TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. |
| v. | § | 5:01-CV-036 |
| | § | |
| BECTON DICKINSON & COMPANY, | § | <u>JURY TRIAL DEMANDED</u> |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## <u>PLAINTIFF'S THIRD AMENDED COMPLAINT</u>

Retractable Technologies, Inc. ("Plaintiff" or "Retractable") files this third amended complaint against Becton Dickinson & Company; Tyco International (US), Inc.; Tyco Healthcare Group, L.P.; Novation, L.L.C.; VHA, Inc.; Premier, Inc.; and Premier Purchasing Partners, L.P. (collectively called "Defendants").

Plaintiff brings this civil action against Defendants to recover injunctive relief and damages arising out of their violations of the antitrust laws of the United States, as well as the common law and antitrust law of Texas, and demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Plaintiff asserts that Defendants combined or conspired to eliminate or lessen competition and to acquire and maintain monopoly power among hospitals and healthcare providers. The conspiracy was intended to, and did, have a foreseeable and substantial effect on U.S. commerce.  As a result of these activities, Plaintiff alleges causes of action against Defendants arising under the state and federal antitrust acts.  Plaintiff also asserts that Defen-

Third Amended Complaint - 1

dants have tortiously interfered with Plaintiff's existing and prospective business relationships and contracts. Plaintiff also asserts that Defendants have used disparaging words against Plaintiff and its products, and that such words are grounded in falsity and made with malice. Plaintiff has suffered cognizable injuries as a result of Defendants' wrongful conduct. In support of these claims, Plaintiff respectfully shows the following:

## I. PARTIES

1.       Retractable Technologies, Inc. ("Retractable" or "Plaintiff") is a Texas corporation.

2.       Becton Dickinson & Company ("Becton Dickinson") is a foreign corporation duly formed and existing under the laws of the State of New Jersey. Becton Dickinson has been previously served and can be served with this amended complaint in accordance with the certificate of service.

3.       Tyco International (US), Inc. is a foreign corporation duly formed and existing under the laws of the State of Massachusetts. On information and belief, Tyco International (US), Inc. was formerly known by the name "Tyco International, Ltd." and was previously authorized to do business in Texas under that name. Tyco International (US), Inc. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

4.       Tyco Healthcare Group, L.P. is a Delaware partnership, and a Tyco International (US), Inc. affiliated company. On information and belief, Tyco Healthcare Group,

Third Amended Complaint - 2

L.P. was formerly named the Kendall Company, L.P.  Tyco International (US), Inc. and Tyco Healthcare Group, L.P. shall be referred to individually and collectively as "Tyco." On further information and belief, other Tyco affiliates such as Kendall Healthcare Products Company and Sherwood-Davis & Geck are equally liable for the actions and omissions giving rise to this lawsuit, and use of the term "Tyco" herein includes those entities as well. Becton Dickinson and Tyco shall be collectively referred to as "Defendant Manufacturers." Tyco Healthcare Group, L.P. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

5.     Novation, L.L.C. is a foreign corporation duly formed and existing under the laws of the State of Delaware, with its principal place of business in Irving, Dallas County, Texas.  On information and belief, Novation, L.L.C. was formed through a merger transaction between defendant VHA, Inc. and non-party UHC, Inc., and remains affiliated with defendant VHA, Inc.  On further information and belief, Novation, L.L.C. is being sued not only as an independent entity, but also as an agent for its member facilities.  Novation, L.L.C. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

6.     VHA, Inc. is a foreign corporation duly formed and existing under the laws of the State of Delaware, with its principal place of business in Irving, Dallas County, Texas. VHA, Inc. and Novation, L.L.C. shall be referred to individually and collectively as "Novation."  On information and belief, VHA, Inc. is being sued not only as an independent entity, but also as an agent for its member facilities.  VHA, Inc. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

Third Amended Complaint - 3

7.     Premier, Inc. is a foreign corporation that does business in Texas.  Premier, Inc. has obtained a certificate of authority, and is duly authorized to transact business in the State of Texas. On information and belief, Premier, Inc. is being sued not only as an independent entity, but also as an agent for its member facilities.  Premier, Inc. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

8.     Premier Purchasing Partners, L.P. is a limited partnership doing business in Texas.   Premier, Inc. and Premier Purchasing Partners, L.P. shall collectively be referred to as "Premier." On information and belief, Premier Purchasing Partners, L.P. is being sued not only as an independent entity, but also as an agent for its member facilities. Premier Purchasing Partners, L.P. has been previously served and can be served with this amended complaint in accordance with the certificate of service.

## II.  JURISDICTION AND VENUE

### A.     SUBJECT MATTER JURISDICTION

9.     This action arises under the state and federal antitrust acts and the statutory and common law of Texas. The antitrust conspiracy that is the subject of this action, including activities in furtherance of the conspiracy in the United States and elsewhere, was intended to and did have a reasonably foreseeable, direct and substantial effect upon U.S. commerce, including but not limited to commerce among the states. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 15(a), 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367(a).

**B.      PERSONAL JURISDICTION**

10.      This Court possesses personal jurisdiction over Becton Dickinson because it regularly does business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

11.      This Court possesses personal jurisdiction over Tyco International (US), Inc. because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

12.      This Court possesses personal jurisdiction over Tyco Healthcare Group, L.P. because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

13.      This Court possesses personal jurisdiction over Novation, L.L.C. because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

14.      This Court possesses personal jurisdiction over VHA, Inc. because it regularly does business in the State of Texas, because it maintains an office, place of business and/or agency for transacting business in the State of Texas, and because of its commission of a tort

in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

15.     This Court possesses personal jurisdiction over Premier, Inc. because it regularly does business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

16.     This Court possesses personal jurisdiction over Premier Purchasing Partners, L.P. because it regularly does business in the State of Texas, and because of its commission of a tort in whole or in part, that is at issue in this matter, in the United States, Eastern District of Texas.

C.     **VENUE**

17.     Venue for this case is proper in the United States District Court for the Eastern District of Texas, Texarkana Division, pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside (as defined by 28 U.S.C. § 1391(c)) in the Eastern District of Texas; maintain principal offices and an agent in the Eastern District of Texas; are aliens; or a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

### III.  FACTS & ALLEGATIONS

A.     **GENERAL BACKGROUND**

18.     Retractable designs, develops, manufactures, and markets hypodermic products that have retractable needles ("Retractable's safety devices") for use in the healthcare industry. Retractable's safety devices represent a breakthrough in safety for healthcare providers. They operate so the needle automatically withdraws from the patient and retracts into

Third Amended Complaint - 6

the barrel of the hypodermic product. This helps prevent the potentially life-threatening needle stick injuries that can result from handling non-retractable needle devices after they have been exposed to infectious bodily fluids.

19.    Retractable's safety devices have a demonstrated success in sharply reducing (i) the incidence of needle stick injuries, and the (ii) associated risks of exposure to deadly blood borne pathogen diseases such as HIV, hepatitis B, and hepatitis C. Retractable's safety devices are so novel that the United States Patent and Trademark Office has granted several patents covering those devices.

20.    Defendants Becton Dickinson and Tyco are large corporations that also manufacture hypodermic products. Becton Dickinson and Tyco manufacture what they term a safety syringe, using technology that is different from, and inferior to, Retractable's technology. Novation and Premier do not manufacture, handle, or ship medical devices, with the possible exception of certain private label products. Instead, Defendants Novation and Premier are administrative "middlemen," the conduit between medical device manufacturers and healthcare providers, also known as "Group Purchasing Organizations" or "GPOs."[1] In practice, Defendant GPOs' true function in the medical device market is to deliver substantial market share to monopolistic medical device manufacturers, such as Defendant Manufacturers, in exchange for substantial "administrative fees" and other forms of remuneration and benefits. The GPOs in this case are being sued not only as independent entities, but also as agents for their member facilities.

---

[1] In some portions of this Complaint, Plaintiff shall refer to "Defendant GPOs" to represent Novation, L.L.C.; VHA, Inc.;  Premier, Inc.; and Premier Purchasing Partners, L.P.

21.     The hospitals and other healthcare providers who are members of GPOs retain their individual capacity to act collectively with other purchaser-members in the GPOs and with the GPO itself.  As such, the GPOs are not unitary organizations, but are comprised of autonomous or semi-autonomous members.  The members of each GPO, as autonomous entities, both (i) retain the capacity to act collectively, and (ii) have acted collectively as participants in the GPOs.

**B.     THE DEFENDANTS' CONSPIRACY TO RESTRAIN TRADE UNLAWFULLY AND OTHERWISE TO ELIMINATE OR LESSEN COMPETITION**

22.     This lawsuit concerns the sale of hypodermic products either with or without the assistance of GPOs and eventually sold to hospitals, healthcare providers, and consumers throughout the United States.  "Hypodermic products" include several discrete relevant markets, composed of needles and syringes, blood collection devices and their needles, dental syringes and their needles, winged IV devices and their needles; and catheter devices and their needles.

23.     These markets for hypodermic products are divided into discrete sub-markets, as each product comes in quite different safety and nonsafety forms and have hospital and nonhospital uses, with dramatically different pricing.  Accordingly, there are four submarkets for needles and syringes (safety, non-safety, hospital, nonhospital); four submarkets for blood collection devices, holders and their needles; four submarkets for dental syringes and their needles; four submarkets for winged IV devices and their needles; and four submarkets for catheter devices and their needles.  Safety and non-safety products are defined in the fed-

eral legislation on sharps injury prevention known as the *Needlestick Safety and Prevention Act.*

24.     Upon information and belief, until the end of 1999, Defendant Becton Dickinson controlled approximately seventy percent (70%) of the market for hypodermic products in the United States, and Becton Dickinson and Tyco together controlled well over ninety percent (90%) of that market.  Due to a shift in the control of GPO contracts at the end of 1999, Becton Dickinson now has control over ninety percent (90%) of that market.

25.     Defendant Manufacturers and GPOs have (i) contracted, combined, and conspired, and (ii) attempted to acquire, and have acquired and maintained, their dominant market position by engaging in a systematic and pervasive course of illegal conduct designed to unlawfully restrain trade and exclude and suppress competition in the relevant markets in violation of the state and federal antitrust laws.  As a proximate result of the exercise of monopoly power and unlawful anti-competitive acts, Retractable and other manufacturers have only been able to sell only a limited number of needles, syringes and blood collection products, and have been totally excluded from other needle product markets, such as for winged IVs, catheter devices, dental syringes, and veterinary syringes.

26.     With or without the assistance from Defendant GPOs, Defendant Manufacturers have unlawfully used their power in the markets for non-safety needles and syringes and non-safety blood collection devices as traditional leveraging to improve and maintain their market share for Defendants' inferior products, and to inhibit entry by or to exclude Retractable and other manufacturers from markets for safety needles and syringes, safety blood collection devices, winged IVs, catheter devices, and dental syringes.  This leveraging is unjus-

tified and is used by Defendants in ways other than by competitive means, and with the intent of inhibiting entry by or excluding Retractable and other manufacturers from competing with Defendant Manufacturers in these markets.

27.     In addition, Defendants have unlawfully used their market power as a defensive leveraging strategy to foreclose competition because of worries about a possible market decline in non-safety needles and syringes and non-safety blood collection devices.  This leveraging is unjustified and is used by Defendants in ways other than by competitive means, and with the intent of inhibiting entry by or excluding Retractable and other manufacturers from competing with Defendant Manufacturers in these markets.

28.     With the knowledge, consent, and assistance of Defendant GPOs, Tyco and BD engaged in a horizontal conspiracy to divide the markets for needles and syringes and veterinary syringes, whereby BD was permitted to acquire and maintain its dominance in the market for needles and syringes, and whereby Tyco was permitted to acquire and maintain its dominance in the markets for dental syringes and veterinary syringes.

29.     The exclusionary agreements between BD, Tyco and the GPOs in the aggregate foreclosed competition and precluded competitors (including Retractable) from achieving sufficient economies of scale to compete with Defendant Manufacturers in the relevant markets.

30.     With the knowledge, consent, and assistance of Defendant GPOs, and with the intent to acquire and maintain their dominant and anti-competitive market position in the market for needles and syringes, Defendant BD has sold and continues to sell its safety nee-

dle and syringe products at a price that is approximately 10% below actual manufacturing cost.

31.    With the knowledge, consent, and assistance of Defendant GPOs, Defendant Manufacturers have used anti-competitive sales and marketing practices (such as tying, bundling, illegal kickbacks, bribes, and other financial inducements) and have entered into exclusive dealing contracts and/or other agreements with Defendant GPOs, other GPOs, hospitals, and healthcare providers to unlawfully channel the purchasing decisions to Defendant Manufacturers for hypodermic products in derogation of competition.  These combinations and the resulting anti-competitively favored access have enabled Defendant Manufacturers to acquire and maintain their dominant and anti-competitive market position in the relevant markets.

32.    Specifically, through contracts and other agreements between Defendant Manufacturers and Defendant GPOs, Defendant Manufacturers induced Defendant GPOs to grant Defendant Manufacturers virtually exclusive availability to purchases of member hospitals and healthcare providers, and induced Defendant GPOs and healthcare providers not to deal with, contract with, or enter into business relationships with Defendant Manufacturers' competitors, including Plaintiff, in the relevant markets.   Defendant Manufacturers have taken such actions with the knowledge, consent, and assistance of Defendant GPOs.  Examples of these actions and combinations include, but are not limited to, the following:

      a.  Tyco exercised control over VHA, Inc. and the relevant markets when representatives of VHA, Inc. told Retractable representatives that they would need permission from Tyco to allow Retractable to sell products to "VHA facilities."  Retractable was further told by a VHA representative that without Tyco's permission, no sales of Retractable products would ever occur in VHA facilities, even if Retractable provided their hypodermic products for free.

This exercise of market power unreasonably constrained consumer choices among market alternatives and caused loss of sales for Retractable.

b. Becton Dickinson exercised control over Novation and the relevant markets when representatives of Novation told Retractable representatives that they wanted to market Retractable's blood collection product by substantially raising its price and splitting the profits. However, it was made clear that Becton Dickinson would have to approve such an arrangement. This exercise of power unreasonably constrained consumer choices among market alternatives, adversely affected the entry of a competitor to the market, and caused loss of sales for Retractable.

c. Becton Dickinson exercised control over Premier when a representative of Premier sent a letter to Doug Hawthorne, President and CEO of Presbyterian Healthcare System, a founding and shareholding member of Premier, stating that in order for Retractable to break into the market he would recommend that Retractable visit a Premier-Becton Dickinson development site and pay to have the product evaluated against other technologies, including Becton Dickinson's products. He further recommended that Retractable contact specific people at Mount Sinai Hospital in New York, who upon information and belief have ties to Defendants Premier and Becton Dickinson, to have the product evaluated, at a cost of $1 million. Upon further information and belief, these suggestions were nothing more than a charade, another barrier to the relevant markets. This exercise of power unreasonably constrained consumer choices among market alternatives and caused loss of sales for Retractable.

d. Becton Dickinson exercised control over Novation when Baptist Health System, a San Antonio, Texas facility under a VHA Opportunities Contract, reported that if it purchased even one box of Retractable hypodermic products, it would lose $300,000 in rebates and incentives.

e. Defendant Manufacturers and VHA/Novation exercised control over the market for safety and non-safety needles and syringes through VHA/Novation's Opportunity program, by warning that member hospitals that failed to purchase 95% of their needles and syringes from VHA's "sole source" supplier would lose present and past rebates for needles, syringes, and 12 other categories of unrelated products. This bundling strategy unreasonably restrained competition, as Retractable and other competitors were unable to discount needles and syringes to a price level that would offset consumers' loss of the 13 category rebates.

f. BD and Premier exercised control over the market for safety and non-safety needles and syringes through unreasonable enforcement of Premier's Letter of Commitment with hospitals. Despite contract clauses that afforded member hospitals an opportunity to seek an exemption from Premier's sole

source contract for needles and syringes, Premier deferred decisions regarding waiver requests to BD for approval.  Not surprisingly, BD did not permit member hospitals to obtain a waiver.  This strategy placed member hospitals in the precarious position of either purchasing BD's needles and syringes or being expelled from Premier for purchasing elsewhere.

g.  BD exercised control over the market for safety and non-safety needles and syringes through two campaigns known as "Block Terumo," that sought to prevent Terumo Corporation from increasing its market share in the market for blood collection devices and needles and syringes in the United States and abroad.  When that strategy failed, BD then implemented "Project East," wherein BD initiated attempts to divide the world market for needles, syringes, and blood collection devices with Terumo.

33.     Defendants' actions (i) decreased quality of hypodermic products, (ii) unreasonably restricted consumer and provider choice and access to safer, higher quality products; (iii) increased Defendants' market power, and (iii) had a dramatic anti-competitive impact in restraining entry of competition into the relevant markets.  The actions and combinations described herein have substantially decreased competition in Texas and in interstate commerce. The pervasive control by Becton Dickinson and Tyco, through interlocking contracts and its relationship with GPOs, effectively prevents GPO members from shopping elsewhere. While healthcare providers not a member of a GPO could theoretically make purchases from some manufacturer other than Defendant Manufacturers, that same control has kept other competitors, such as Retractable and Terumo, out of the relevant markets as consumers cannot collectively turn to other manufacturers for alternatives.

34.     Furthering the "sole source" supplier relationship with Defendant Manufacturers, through unlawfully created interlocking, exclusive, multi-year contracts between and among (i) Defendant Manufacturers, (ii) Defendant GPOs, and (iii) certain hospitals and other healthcare providers, Defendant GPOs have required and continue to require some

Third Amended Complaint - 13

hospitals and healthcare providers to purchase more than ninety percent (90%), and in some cases one hundred percent (100%) of their medical devices through Defendant GPOs. This ninety percent (90%) plus requirement is evidenced in such items as contracts, Contract Commitment Schedules, and Contract Information Sheets. Examples of such contracts are the Premier Purchasing Policy and the Contract Information Sheet between Premier and Becton Dickinson for the Hypodermic Products (Sole Source Award) PP-MS-012A. This type of anti-competitive bundling strategy has blocked entry by a potentially formidable competitor.

35.     Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, also illegally provided kickbacks to (i) Defendant GPOs, (ii) other GPOs, (iii) hospitals, (iv) healthcare providers, and (v) other individuals -- in the form of "administrative fees," "discounts," "rebates," "reimbursements," and/or "incentives." Evidence of these illegal kickbacks includes, but is not limited to:  the Premier/Becton Dickinson January 2001 Agreement Alignment, and VHA/Novation's side letters and "marketing agreements" that, notwithstanding Defendant GPOs' claim of cost savings, benefit the GPOs more when prices increase.  Defendant Manufacturers also provided other remuneration to induce GPOs to award sole source contracts and to reveal competitors' confidential bidding information, and attempted to induce hospitals, CEOs, other hospital employees, and healthcare providers to (i) grant Defendant Manufacturers virtually exclusive availability to purchases by these groups, and (ii) to induce Defendant GPOs not to contract or enter into business relationships or contracts with Defendant Manufacturers' competitors, including Plaintiff, in the relevant markets.

Third Amended Complaint - 14

36.     Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, also monitored and illegally threatened Defendant GPOs, other GPOs, hospitals, and healthcare providers with sanctions consisting of, but not limited to:  (i) expulsion or threat of expulsion from the GPO, (ii) withdrawal of product availability, (iii) withdrawal of business opportunities, and (iv) withdrawal of financial incentives and kickbacks.  An example includes, but is not limited to when Premier threatened the withdrawal of financial incentives of Becton Dickinson if a hospital or facility participated in an evaluation contract for Retractable products offered by Premier.  Premier also threatened to expel Iowa Health Systems as a stockholder member for breach of a Purchasing Partners Compliance Policy.  These actions were taken to induce Defendant GPOs, other GPOs, hospitals, and healthcare providers to grant Defendant Manufacturers virtually exclusive availability to purchases by these groups, and to induce Defendant GPOs not to deal with, contract with, or enter into business relationships with Defendant Manufacturers' competitors, including Plaintiff, in the relevant markets.

37.     Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, have unlawfully induced hospitals and healthcare providers to purchase their inferior hypodermic products in part through the use of "tying," bundling, and other comparable anti-competitive leveraging arrangements.  Specifically, Defendant Manufacturers, with the knowledge and assistance of Defendant GPOs, have included their less desirable hypodermic products provided by Defendant Manufacturers and an array of non-hypodermic products that hospitals and healthcare providers are required to purchase in order (i) to be rewarded with discounts and financial incentives, or (ii) to avoid sanctions and penalties.

The Defendant Manufacturers, with the knowledge and assistance of the Defendant GPOs, bundle many products needed by a GPO member from Defendant Manufacturers with its inferior hypodermic products, and by use of its relevant market power and member-penalties for non-compliance, leveraged the members into purchasing Defendant Manufacturers' diminished inferior products in the relevant markets and other markets such as for safety needles and syringes, safety blood collection devices, the winged IV market, catheter market, and dental syringe market, thereby reducing (i) the quality of the products in the markets, (ii) consumer and provider choice and access to safer, higher quality products; (iii) competition within the relevant markets, and (iv) competition for any reasonably interchangeable alternative product. These actions have further substantially decreased competition in these markets throughout Texas and interstate commerce.

38.    In addition to the contracts and other agreements that establish the existence of the concerted action and conspiracy between Defendant Manufacturers and Defendant GPOs, evidence of such concerted action and conspiracy is found in the actions of Defendants' attempts to "correct" their prior illegal actions in ways that include but are not limited to:

a. by Premier granting Plaintiff – on a superficial level – an opportunity to participate in the needle and syringe market through an evaluation contract. During this process, however, such Defendants continued to maintain the illegal purchasing practices, kickbacks, threats, and pricing structures in order to induce hospitals and healthcare providers to continue to purchase the products of Defendant Manufacturers. Premier notified hospitals and facilities that choosing another product could affect Becton Dickinson contract incentives. Not surprisingly, Defendants were successful in their attempts to unreasonably restrain competition in the relevant markets, with an adverse effect on the welfare of consumers and providers (who must make use of inferior products at greater risk to their safety); and

b. by Defendant GPOs, in the face of Retractable's claims and federal investigations into Defendants' anticompetitive activity, amending their ethics

guidelines to eliminate improper practices alleged in Retractable's allegations against Defendants.

39.     Defendant Manufacturers unreasonably constrained consumer choices among market alternatives through Defendants' collective action in restricting access to distributors. An illustration of this behavior by way of analogy is that both companies managed to keep Terumo's hypodermic products out of the relevant markets by contracting with distributors to carry only their manufactured hypodermic products.  This exercise of power effectively made it impossible for Terumo to get its products delivered to U.S. healthcare facilities. These actions also decreased quality, increased defendants' market power and had a dramatic impact unreasonably restraining entry into the relevant markets.

40.     Defendants took such action collectively and individually with a specific intent to monopolize the relevant markets and to leverage that monopoly into other markets, and with the effect of lessening competition.  Defendants have been successful in the creation of a monopoly.  In the alternative, Defendants' actions, if allowed by this court to continue, present a dangerous risk of reaching monopoly power under the circumstances.

41.     Retractable was injured and financially damaged as a result of such illegal conduct.

## C.     THE DEFENDANTS' INTERFERENCE WITH RETRACTABLE'S EXISTING AND PROSPECTIVE CONTRACTS

42.     Retractable reiterates the factual allegations contained in paragraphs 1-41.

43.     Prior to the events in controversy, Retractable had entered into contractual relationships with a number of hospitals and healthcare providers for the sale of Retractable's superior hypodermic products.  The following incidents of interference with existing con-

tracts are examples of the many instances of interference with existing contracts that occurred:

a.  Retractable entered into a contract for safety hypodermic products with Kaiser Foundation Health Plan, Inc. in 1999 that made Retractable one of two companies (Becton Dickinson being the other) that supplied safety hypodermic products to the Kaiser hospital system.  Shortly after that contract went into effect, Becton Dickinson and Kaiser announced the establishment of a Becton Dickinson funded $30 million joint clinical study and a joint product development program.  This agreement allowed Kaiser facilities to purchase Becton Dickinson safety-engineered medical devices at non-safety prices and called for a study of safety-engineered medical device effectiveness in Kaiser facilities.  After the Kaiser agreement became effective, (i) Retractable had to negotiate a contract with a Kaiser-dictated-distributor that demanded a huge rebate, (ii) Retractable's products were moved into facilities more slowly that Becton Dickinson's, (iii) Retractable's products were ordered by Kaiser facilities in sizes and quantities which did not reflect actual usage, (iv) false rumors that Retractable's products were on backorder circulated, and (v) Retractable's products were finally removed from Kaiser because of reported minor defects that were within standard tolerances.  Further, BD and Kaiser's agreement to offer safety products at non-safety prices on hypodermic products other than syringes made it impossible for Retractable and other manufacturers to compete for business in those other product areas, including but not limited to blood collection devices. That same agreement also caused Kaiser to limit the usage of Retractable syringes to specific products (3cc syringes only), to specific departments within the facilities, and to certain types of patients (non-cooperative and combative).  Becton Dickinson's willful and intentional acts were the proximate cause of Retractable's products ultimately being pulled from the shelves of Kaiser facilities, and Retractable has suffered the loss of sales under that contract.

b.  Retractable entered into a contract for safety hypodermic products effective April 1, 1998, through January 31, 2001, with the Department of Veterans Affairs, Federal Supply Schedule Contact No. V797P-3646k.  Sales representatives from Becton Dickinson worked tirelessly to interfere with meetings scheduled at VA hospitals, pressuring purchasing agents to delay Retractable evaluations and using Becton Dickinson evaluation and presentation time to discuss reasons (false) the hospital should not buy Retractable products rather than reasons it should buy Becton Dickinson products.  Becton Dickinson's willful and intentional acts were the proximate cause of Retractable's loss of sales under that contract.

    c. Retractable has had various contracts with Sortimat Assembly Systems, Inc. from October 27, 1995, to build automated assembly equipment. Some time in the year 2000, Retractable learned that at some time in the years preceding, Becton Dickinson representatives pressured Sortimat to cease doing business with Retractable. Retractable has also learned that Retractable was not offered the best machine Sortimat could have made for it. Further, Sortimat has not lived up to its warranty requirements on the machines it made for Retractable which, on information and belief, occurred because Becton Dickinson pressured and offered financial incentives to Sortimat to breach its warranty requirements. Becton Dickinson's willful and intentional acts were the proximate cause of loss of sales because of problems with its assembly machines.

    44.    Further, Retractable was in the process of, and continues to negotiate and discuss contractual relationships with a number of hospitals, distributors, and healthcare providers for the sale of Retractable's superior hypodermic products. Several of such prospective relationships were reasonably certain to have resulted in actual contracts between Retractable and hospitals and healthcare providers, given the prospective customers' pleasure with Retractable's (i) superior products in providing safety for healthcare workers in preventing life-threatening needle stick injuries, and (ii) price. The following incidents of interference with prospective contracts are examples of many instances of interference that occurred:

    a. Retractable had dealings with Tenet HealthSystem Medical, Inc. and its facilities during the last quarter of 1998 and the first quarter of 1999. These dealings included evaluations of Retractable's products where positive feedback resulted. After such evaluations, Tenet sent a proposed contract for Retractable to sign, which upon award would give Retractable approved vendor status within the Tenet system. Although Retractable was able to show that its products would save hospitals money, ultimately Retractable was not awarded a Tenet contract. Upon information and belief, Becton Dickinson interfered with that potential contract, by, among other things, giving Tenet better pricing and other incentives if it would specifically not award a contract to Retractable. Becton Dickinson's willful and intentional acts were the proximate cause of loss of sales under that potential Tenet contract.

    b. Retractable had dealings with Columbia/HCA Healthcare Corporation and its facilities during most of 1997 and into 1998. These contacts resulted in

Third Amended Complaint - 19

over sixty Columbia facilities being interested in purchasing Retractable's products. When a meeting was set up to discuss volumes and pricing at the end of 1997, (i) the meeting was abruptly canceled, (ii) Retractable representatives were told that the meeting was no longer a priority, and (iii) Retractable representatives were told that the meeting would not be rescheduled for several months. Retractable was further told that although the meeting was to be to discuss price, the Retractable products were too expensive, so no meeting would occur. Upon information and belief, Becton Dickinson interfered with that potential contract, by, among other things, giving Columbia better pricing and other incentives if it would not award a contract to Retractable. Becton Dickinson's willful and intentional acts were the proximate cause of loss of sales under that potential Columbia contract.

45. As a direct result of Defendants' conspiracy to monopolize and anti-competitive behavior, as well as conduct in providing kickbacks, threats, sanctions, inducements, and other illegal conduct, hospitals and healthcare providers which had contracted with Retractable terminated their contractual relationships in order to conduct business with Defendant Manufacturers and Defendant GPOs.

46. As a direct result of Defendants' conspiracy to monopolize and anti-competitive behavior, as well as conduct in providing kickbacks, threats, sanctions, inducements, and other illegal conduct, hospitals and healthcare providers who had reasonable probabilities of entering into contractual relationships with Retractable terminated their contacts and refused to enter into contractual relationships.

47. The result of such conduct of Defendants was foreseeable, and occurred directly as a result of Defendants' intentional and malicious actions for the purpose of building and maintaining their monopolistic practices, as well as for the purpose of harming Plaintiff and other competitor manufacturers of hypodermic products. The evidence will show that under such circumstances, Defendants acted illegally and without privilege or justification in taking such coercive action.

48.     Retractable was injured and financially damaged as a result of such conduct.

## D.     DEFENDANTS' CONDUCT IN DISPARAGING PLAINTIFF AND PLAINTIFF'S PRODUCTS

49.     Retractable reiterates the factual allegations contained in paragraphs 1-48.

50.     In the course of building and maintaining its monopolistic practices, Defendants published to Retractable's customers, prospective customers, other GPOs, and other purchasers of hypodermic products certain statements about Retractable and the quality of Plaintiff's products.  Some specific examples of such disparagement include, but are not limited to:

a.  Telling representatives of the healthcare workers union, the SEIU, that Tom Shaw is the reason that no one will purchase Retractable products;

b.  Publishing to healthcare workers that the Retractable products deliver inaccurate dosaging;

c.  Publishing to healthcare workers that the Retractable products cause hematomas;

d.  Telling members of the financial world that the Retractable products cannot be manufactured for less than $.50 per syringe, a cost that would not allow for widespread use, because of difficulties manufacturing in high volumes; and

e.  Telling healthcare workers that Retractable's employees are not reasonable business people.

51.     Such statements were, at the time, and continue to be, false statements of fact.

52.     Defendants were aware of the statements' falsity at the time, and they nonetheless elected to make such statements.  In the alternative, Defendants entertained serious doubts as to the truthfulness of the statements about Plaintiff and Plaintiff's products, and nevertheless elected to make such statements.

53.     The result of such false statements of Defendants was foreseeable, and occurred directly as a result of Defendants' intentional and malicious actions for the purpose of building and maintaining their monopolistic practices; such statements were made with ill will for the purpose of harming the Plaintiff in the relevant markets.  The evidence will show that under such circumstances, Defendants acted with malice and without privilege in making such statements.

54.     Retractable was injured and suffered special damages as a result of such statements and conduct.  Retractable suffered (i) a loss of reasonably foreseeable net profits, (ii) lost goodwill from prospective purchasers, and (iii) lost standing and suffered discouragement of prospective purchasers by being held in disrepute.

**E.     EFFECTS OF DEFENDANTS' PRACTICES IN ELIMINATING OR LESSENING COMPETITION**

55.     The effects of Defendants' unlawful, anti-competitive conduct are extreme, and have directly and proximately caused injury to the Plaintiff in the relevant markets.  Defendants' unlawful conduct has also unreasonably restrained competition in the relevant interstate market or markets and has unreasonably restrained the reasonable interchange of product alternatives for the relevant markets; and such anti-competitive effects outweigh any negligible pro-competitive benefits.

56.     One consequence of the unlawful, anti-competitive conduct has been lack of access for many thousands of healthcare providers and consumers to the superior safety medical devices offered by smaller competitors, such as Retractable.  Upon information and belief, Defendants' deliberate conduct in this regard has resulted in thousands of preventable needle sticks, injuries, disease and deaths, along with very substantial costs in time lost from

work, mental anguish, and the diagnosis and treatment of serious and life-threatening diseases.  These concerns are embodied in federal legislation aimed at providing enhanced safety for healthcare providers who are at risk from needle sticks.

57.    A second consequence of this unlawful, anti-competitive conduct has been that Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, have been successful in directly fixing prices in the nationwide market for hypodermic products and/or in the products in the leveraged markets.  More specifically, Defendant Manufacturers have been successful at charging purchasers of hypodermic products and/or other leveraged market products roughly the same price, which eliminates or reduces competition in these market areas.  In the alternative, because of the acts of Defendants, the resulting price for the purchase of hypodermic products and/or products in the leveraged markets are virtually parallel nationwide, and cannot be explained merely in terms of coincidence, fate, or the conformity of behavior due to unilateral action.

58.    A third consequence of this unlawful, anti-competitive conduct has been that Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, have been successful in indirectly fixing prices in the nationwide market for hypodermic products and/or products in the leveraged markets.  More specifically, Defendant Manufacturers and Defendant GPOs have indirectly influenced the price for hypodermic products and/or other leveraged market products by (i) restraining competition in the relevant markets, (ii) limiting available supply of similar products to member hospitals and healthcare providers, (iii) refusing to deal with and thereby blocking entry of competitors of Defendant Manufacturers, and (iv) exchanging information that has an influence on pricing decisions.  Alter-

natively, because of the acts of Defendants, the resulting price for the purchase of hypodermic products and/or other leveraged market products are virtually parallel nationwide, and cannot be explained merely in terms of coincidence, fate, or the conformity of behavior due to unilateral action.

59.     A fourth consequence of this unlawful, anti-competitive conduct has been that Defendant Manufacturers, with the knowledge, consent, and assistance of Defendant GPOs, have deprived Plaintiff and others of the benefit of free and open competition in the sale of hypodermic products and/or other leveraged market products.  These practices (i) decreased quality of those products, (ii) increased Defendants' market power or powers, (iii) unreasonably restrained entry into the relevant markets, (iv) increased costs to consumers by preventing competitive entrants from reaching economies of scale, and (v) unreasonably restrained competition by channeling consumer choices to Defendant Manufacturers' products, thereby effectively excluding all competing vendors' access to the hypodermic product market and/or other leveraged markets and unreasonably constraining consumer choices among market alternatives.  These actions permit Retractable to recover from Defendants:  (1) actual damages in lost profits and additional compensation; (2) punitive damages; (3) additional damages as provided by statute; (4) injunctive relief; (5) costs of suit, including reasonable attorney fees and prejudgment and post-judgment interest.

## IV.  CAUSES OF ACTION

### A.     STATE AND FEDERAL ANTITRUST ACTS

60.     Retractable reiterates the factual allegations contained in paragraphs 1-59.

61.    The illegal conduct of Defendants, in concert and in conspiracy with one another, violates state and federal antitrust law in the following manner:

a.  by combining or conspiring between and among themselves to eliminate, reduce, or interfere with nationwide competition in the selling of hypodermic products and/or other leveraged market products;

b.  by conspiracies between BD and Tyco to divide the markets for needles and syringes, dental syringes, and veterinary syringes;

c.  by BD's predatory pricing practices in selling its safety needle and syringe products;

d.  by using Defendant GPOs to provide different prices for members versus non-member suppliers and purchasers for the sale and purchase of goods of similar grade and quality, resulting in substantial competitive injury to interstate commerce and competition;

e.  by entering into exclusive dealing contracts or other anti-competitive agreements to purchase or exclusively provide to member hospitals and healthcare providers only those hypodermic products and/or other leveraged market products manufactured by Defendant Manufacturers;

f.   by entering into contracts or other agreements not to deal with, contract, or purchase hypodermic products manufactured by Plaintiff or other manufacturers.

g.  by agreeing to use interlocking, multi-year, anti-competitive contracts and agreements that directly affected, limited, or avoided competition;

h.  by providing kickbacks, bribes and other illegal financial incentives to affect, limit, and avoid competition in the market for hypodermic products and/or in other leveraged products markets, and to enter into future transactions;

i.   by receiving kickbacks, bribes, and other illegal financial incentives to affect, limit, and avoid competition in the market for hypodermic products and/or in other leveraged products markets, and to enter into future transactions;

j.   by illegally threatening purchasers and potential purchasers of hypodermic products and/or other leveraged market products from making purchases from suppliers other than Defendant Manufacturers, and to enter into future transactions;

Third Amended Complaint - 25

k.  by attempting to use market share in one market as leverage to gain market share in another market or markets other than by competitive means;

l.  by using their market power to coerce purchases of tied products, which resulted in the foreclosure of a substantial amount of commerce in the tied product market or markets and protected their market dominance in the tying product market; and

m.  by directly or indirectly fixing prices in the relevant markets and leveraged product markets.

62.    This behavior by Defendants produced, and continues to produce, adverse, anti-competitive effects on interstate commerce in the United States, including, but not necessarily limited to, commerce in or affecting Texas.

63.    As a proximate result of Defendants' acts, Retractable was denied access to the relevant markets, and was thereby damaged.

64.    As a consequence of Defendants' wrongful acts, Retractable is entitled to recover a joint and several judgment against all Defendants for its actual damages trebled, costs of suit, including reasonable attorneys' fees, and pre-judgment and post-judgment interest at the maximum rate permitted by law.

**B.      STATE ANTITRUST CONSPIRACY TO MONOPOLIZE**

65.    Retractable reiterates the factual allegations contained in paragraphs 1-64.

66.    Defendants acted in direct violation of the state antitrust act in conspiring to monopolize the relevant markets.

67.    Defendants have participated in a conspiracy to monopolize the market for hypodermic products in Texas and the United States. In conducting the conspiracy, Defendants had a common design and understanding, or a meeting of the minds, directed for the purpose of acquiring and maintaining monopoly power in the relevant markets.

68.    As a result of Defendants' intentional and unlawful conduct and conspiracy, Defendants wrongfully blocked Retractable's access to the relevant markets, and thus caused Retractable to sustain damage to its business and property.

## C.    TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

69.    Retractable reiterates the factual allegations contained in paragraphs 1-68.

70.    Defendants interfered with Retractable's business relations, including its existing and prospective business contracts.

71.    Defendants had actual knowledge of the existence of Retractable's contracts and its interest therein, or knowledge of facts and circumstances that would lead a reasonable person to know of their existence.  Defendants have willfully and intentionally committed acts that were calculated to, and did as a result of the interference, cause damage to Retractable in its lawful business.  Defendants' acts were the proximate cause of actual damage and loss to Retractable.

72.    Defendants have also acted intentionally and unlawfully without privilege or justification in a manner that has interfered with Retractable's prospective business relations, and/or has prevented Retractable from entering into business contracts where a reasonable probability existed that the contracts would have been entered into but for these Defendants' interference.  Defendants' intentional, unlawful, and unexcused interference with Retractable's ability to enter into business relations and business contracts with potential purchasers for the sale of hypodermic products was the proximate cause of actual injury and financial damage to Retractable.

73.     Defendants are jointly and severally liable for their actions as described in the foregoing paragraphs.  In addition, because of the knowing or reckless nature of their conduct, Defendants are liable for punitive damages.

**D.     BUSINESS DISPARAGEMENT**

74.     Retractable reiterates the factual allegations contained in paragraphs 1-73.

75.     Defendants have utilized disparaging words against Retractable grounded in falsity and malice.  Defendants lacked privilege in making these statements, knew of these falsities, acted with reckless disregard for the truth, or acted with ill will or intent to interfere in the economic interests of Retractable.

76.     As a result of Defendants' intentional, unlawful, and unexcused use of disparaging words grounded in falsity and malice, Retractable was injured and financially damaged.

77.     Defendants are jointly and severally liable for their actions as described in the foregoing paragraphs.  In addition, because of the knowing and reckless nature of their conduct, Defendants are liable for punitive damages.

**E.     COMMON LAW CONSPIRACY**

78.     Retractable reiterates the factual allegations contained in paragraphs 1-77.

79.     Defendants combined and conspired to defraud Retractable by engaging in the conduct described above, including, but not limited to, price-fixing and tying agreements, bribes and kickbacks, illegal threats, and attempts to monopolize the sale of hypodermic products.  Each Defendant agreed and intended to participate in the conspiracy, and engaged

in one or more overt acts in the United States or Texas, or both, in furtherance of the conspiracy.

80.     As a result of Defendants' intentional, unlawful and unexcused conduct and conspiracy, Defendants wrongfully denied Retractable's access to the relevant markets, thereby injuring Retractable and damaging it financially.

81.     Defendants are jointly and severally liable for Retractable's damages.   Further, because of the knowing and reckless nature of their conduct, Defendants are liable for punitive damages.

## V.   NOTICE

82.     As required by Section 15.21(c) of the Texas Business and Commerce Code, a copy of this third amended complaint has been mailed to the Attorney General of the State of Texas.

## VI.   INJUNCTIVE RELIEF

83.     Defendants and their co-conspirators have engaged in a continuing pattern and practice of antitrust violations that are likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

84.     Retractable seeks an injunction enjoining each Defendant from continuing the unlawful conduct alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes and effects.

## VII.   PRAYER

Accordingly, Plaintiff Retractable Technologies, Inc. respectfully requests that Defendants Becton Dickinson & Company, Tyco International (US), Inc., Tyco Healthcare

Group, L.P., Novation, L.L.C., VHA, Inc., Premier, Inc., and Premier Purchasing Partners,

L.P., be cited to appear, and that Retractable have judgment against Defendants (jointly and

severally where appropriate) for:

      a.  actual damages;

      b.  punitive damages;

      c.  additional and/or treble damages as provided by statute;

      d.  injunctive relief;

      e.  costs of suit, including reasonable attorneys' fees; pre-judgment and post-judgment interest at the maximum rate permitted by law; and

      f.  such other relief to which Retractable may be entitled.


Respectfully submitted,


Nicholas H. Patton
SBN: 15631000
PATTON, TIDWELL & SCHROEDER, L.L.P.
4605 Texas Boulevard
P. O. Box 5398
Texarkana, Texas 7550505398
(903) 792-7080      (903) 792-8233 (fax)

ATTORNEY IN CHARGE FOR PLAINTIFF
RETRACTABLE TECHNOLOGIES, INC.

OF COUNSEL:

PATTON, TIDWELL AND SCHROEDER, L.L.P.
4605 Texas Boulevard
P. O. Box 5398
Texarkana, Texas 75505-5398
(903) 792-7080        (903) 792-8233 (fax)

LANIER LAW FIRM
W. Mark Lanier        SBN: 11934600
P.O. Box  691448
Houston, Texas  77269
(713) 659-5200

O'QUINN & LAMINACK
John M. O'Quinn        SBN: 15296000
2300 Lyric Centre Building
440 Lyric Centre Building
Houston, Texas  77002
(713) 223-1000        (713) 222-6903 (fax)

GILBERT & MOORE, PLLC
John R. Gilbert        SBN: 07898500
222 N. Velasco
P.O. Box 1819
Angleton, Texas  77516-1819
(979) 849-5741        (979) 849-7729 (fax)

MULLIN HOARD & BROWN, L.L.P.
Donald M. Hunt        SBN: 10284000
1500 Broadway, Ste. 700
P.O. Box 2585
Lubbock, Texas 79408-2565
(806) 765-7491        (806) 765-0553 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that I have forward a true and correct copy of Plaintiff's Third Amended Complaint to the following counsel of record by fax transmission on this 17th day of January , 2003:

Mr. W. David Carter
Mercy, Carter & Elliot, L.L.P.
1730 Galleria Oaks Drive
Texarkana, Texas 75503

Mr. Leslie Gordon Fagen
Mr. Robert A. Atkins
Mr. Joseph J. Frank
Paul, Weiss, Rifkind, Wharton
  & Garrison
1285 Avenue of the Americas
New York, New York 10019

Mr. David J. Beck
Mr. Alistair Dawson
Beck, Redden & Secrest, L.L.P.
4500 One Houston Center
1221 McKinney Street
Houston, Texas 77010-2010

Mr. Winford L. Dunn, Jr.
Dunn, Nutter & Morgan, L.L.P.
State Line Plaza, Box 8030
Texarkana, Arkansas  71854

Mr. Robert E. Bloch
Mr. Mitchell D. Raup
Mr. Gary A. Winters
Mayer, Brown, Rowe & Maw
1909 K. St., N.W.
Washington, D.C. 20006

Mr. J. Dennis Chambers
Atchley, Russell, Waldrop
  & Hlavinka
P. O. Box 5517
1710 Moores Lane
Texarkana, Texas 75505

Mr. James K. Gardner
Neal, Gerber & Eisenberg
2 North LaSalle St.
Suite 2200
Chicago, Illinois 60602

Mr. John L. Murchison, Jr.
Mr. John P. DeGeeter
Mr. Bruce A. Blefeld
Vinson & Elkins L.L.P.
2300 First City Tower
1001 Fannin
Houston, Texas 77002-6760

Mr. Damon Young
Young & Pickett
P. O. Box 1897
Texarkana, Arkansas/
  Texas 75504

_Nicholas H. Patton_
Nicholas H. Patton